Filed 7/29/22  In re Xavier W. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| In re XAVIER W., a Person Coming Under the Juvenile Court Law. | B315709 (Los Angeles County Super. Ct. No. 19CCJP05812) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>T.W.,<br><br>        Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Jean M. Nelson, Judge.  Affirmed.

Christopher Blake, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, Sally Son, Deputy County Counsel, for Plaintiff and Respondent.

_____

In this dependency case (Welf. & Inst. Code, § 300 et seq.),[1] T.W. (Mother) appeals from the juvenile court's order terminating her parental rights over her son, Xavier W. (then, three years old).[2] Mother contends we must reverse the order because the court erred in finding the parental-benefit exception to termination of parental rights (§ 366.26, subd. (c)(1)(B)(i)) did not apply to her relationship with her son, as the court did not apply the applicable test set forth in *In re Caden C.* (2021) 11 Cal.5th 614. For the reasons explained below, we agree with Mother that the trial court erred in not applying the correct legal standard under *Caden C.*, but we conclude the error was harmless because there is insufficient evidence in the record as a matter of law to satisfy the factual elements of the *Caden C.* test.

Mother also contends the matter must be remanded for further proceedings under the Indian Child Welfare Act. (25 U.S.C. § 1901 et seq.; (ICWA).) She concedes the Los Angeles County Department of Children and Family Services (DCFS) fulfilled its duties to make inquiries of extended family members and included all requisite information in the ICWA notices it

_____

[1] Undesignated statutory references are to the Welfare and Institutions Code.

[2] The juvenile court did not determine the identity of Xavier's father.

2

sent. She argues, however, that DCFS failed to follow up on "some collateral information" regarding a distant relative's potential tribal affiliation and another relative's affiliation with a non-federally recognized tribe. We conclude DCFS did not have a legal duty under ICWA, or California law interpreting ICWA, to take further action concerning this so-called "collateral information." We affirm the juvenile court's order terminating parental rights.

## BACKGROUND[3]

### I. Prior Dependency Proceedings Involving Mother's Older Children

In May 2019, four months before the referral that led to the present dependency proceedings involving Mother's son Xavier, a juvenile court in San Bernardino County terminated Mother's parental rights to her older children, an eight-year-old son and a three-year-old daughter. The prior dependency proceedings arose from Mother's history of mental health and substance abuse issues. Mother's older children—Xavier's half siblings—were receiving permanency planning services and were living in the home of their prospective adoptive parent, Ms. D.

### II. Detention of Xavier

#### A. Current referral

Shortly before midnight on September 4, 2019, the Los Angeles Police Department received a 911 call regarding an abandoned child in a car parked on a street. A resident in the neighborhood had observed the child standing on the front

---

[3] Facts and proceedings related to the ICWA issues Mother raises on appeal are set forth below in a separate section of this opinion.

passenger seat of the car, crying and screaming. Emergency personnel responded to the scene and extracted 16-month-old Xavier from the car. He was alone in a locked car, and the passenger side window of the car was rolled down four inches. He wore a shirt and a soiled diaper. According to an officer, the child was not in distress. It appeared to the officer that people had been living in the car, as it contained dirty clothes, trash, food, and two unopened bottles of alcohol. Xavier was transported to a hospital, where he did not require medical care and showed no signs of abuse. He was placed in protective custody with DCFS. The following morning, Mother was arrested for child endangerment, after she could not locate Xavier and reported him missing. Mother had a prior arrest in 2010 for the same charge for leaving her older son (then, three months old) unattended.

A DCFS social worker interviewed Mother where she was being held in jail. Mother stated she lived in Bakersfield with Xavier's maternal grandmother. She had driven to San Bernardino County for a court appearance. She stayed in San Bernardino for around two months. On her way back to Bakersfield, on the night before her arrest, she pulled over and parked the car because she needed to get gas. Xavier was sleeping, and she did not want to wake him, so she left him in the car with the windows cracked open. Around 11:00 p.m., she walked to a gas station that was across the street from where she parked the car, but the gas station was closed. She walked further, became lost, and met a man who said he would help her find gas for her car. They rode three buses together, looking for gas, but did not find any. Around 6:30 a.m., the following morning, a woman drove Mother back to the area where Mother

4

had parked the car, and Mother continued to search for gas. At around 8:00 a.m., nine hours after she left Xavier alone in the car, Mother returned to the spot where she had parked the car, and the car was gone. Mother called the police to report that her car and Xavier were missing. Mother turned herself in to the police, and she was arrested.[4]

Mother told the social worker she had been diagnosed with posttraumatic stress disorder and insomnia resulting from childhood trauma. She denied any other mental health issues and said she did not take medication. Mother admitted to near-daily marijuana use to help her sleep. The last time she used was the previous afternoon when she and Xavier stopped at the beach on their drive from San Bernardino to Bakersfield. Mother said she waited an hour after using marijuana before she resumed the drive.[5] From a review of Mother's juvenile court case in San Bernardino County, the social worker learned that Mother had been diagnosed with schizophrenia, bipolar disorder and medication noncompliance.

Mother listed Xavier's maternal grandfather as her support system. He lived out-of-state. Mother said Xavier's maternal

---

[4] Later, during an interview on October 24, 2019, Mother told a DCFS dependency investigator that she left Xavier alone in the car at 11:01 p.m. and returned at 11:15 p.m. to find him missing.

[5] During the subsequent interview on October 24, 2019, Mother told the dependency investigator that when she used marijuana while at the beach with Xavier that day, she smoked "2 blunts."

grandmother did not help her care for Xavier, although they lived together.

### B.     Petition and Detention Hearing

On September 9, 2019, DCFS filed a dependency petition under section 300, subdivisions (b) and (j), alleging Xavier was at risk of harm due to (1) Mother leaving him unattended in a car, as she had done with his older half brother (counts b-1 & j-1); (2) Mother's marijuana abuse, resulting in Mother being under the influence of marijuana on multiple occasions while Xavier was in her care (counts b-2 & j-2); (3) Mother's mental and emotional problems, including schizophrenia, bipolar disorder, and posttraumatic stress disorder, and her history of involuntary hospitalizations, which rendered Mother incapable of providing regular care for and supervision of Xavier (counts b-3 & j-3); and (4) Mother driving Xavier while under the influence of marijuana on the day she left him unattended in the car (count b-4).  The allegations in counts b-1/j-2—b-3/j-3 reference the similar conduct of Mother at issue in the San Bernardino County dependency proceedings involving Xavier's older half siblings.

Mother was in custody and did not appear at the September 10, 2019 detention hearing.  The juvenile court found DCFS made a prima facie showing that Xavier was a person described by section 300, and the court detained the child from Mother.  Xavier was in a foster home.  The court granted Mother once-monthly monitored visits with Xavier while she was in custody and, after her release, monitored visits to occur two to three times per week.  At the request of Xavier's attorney, the court ordered DCFS to determine if Xavier could be placed in the same foster home as his older half siblings and, if not, to facilitate sibling visits.

6

On September 30, 2019, Mother, who was still in custody, made her first appearance in this matter. The juvenile court appointed counsel for her and arraigned her on the petition. Mother denied the allegations. Xavier remained detained in foster care.

## III. Jurisdiction Over Xavier/Disposition

### A. DCFS's reports filed prior to the adjudication hearing

In preparation of the Jurisdiction/Disposition Report, a DCFS dependency investigator interviewed Xavier's maternal grandmother, who reported Mother was diagnosed with schizophrenia and bipolar disorder when she was 12 years old. As a child, Mother took prescribed medication for these conditions, but over time, Mother stopped taking the medication. Mother and Xavier came to live with the maternal grandmother when Xavier was two months old. The maternal grandmother assisted Mother in caring for Xavier, and she supported Xavier financially. She worried about leaving Xavier alone with Mother due to Mother's short temper, and she believed Mother needed medication for her mental health issues. When Mother would become frustrated, the maternal grandmother "would step in and offer to take Xavier from her and sooth[e] him so that he would not be traumatized." She reported that Mother did fairly well at feeding and changing Xavier and keeping him on a schedule.

DCFS reported in the Jurisdiction/Disposition Report that Xavier would be placed with Ms. D. in November 2019. Ms. D. was in the process of finalizing her adoption of Xavier's half siblings, and she was interested in adopting Xavier to keep the siblings together.

7

As of October 27, 2019, the date DCFS prepared the Jurisdiction/Disposition Report, Mother had not had any visits with Xavier. The detention facility where Mother was housed informed DCFS that Mother could not have any visitors due to her hostile and uncooperative behavior (including spitting, kicking, yelling, and being naked in her cell) and the fact she was on "suicide watch" in the mental health unit.

DCFS recommended in the Jurisdiction/Disposition Report that the juvenile court decline to grant Mother reunification services with Xavier because Mother had not resolved the issues which resulted in termination of reunification services in the case involving Xavier's half siblings (mental and emotional problems, substance abuse, and child safety issues). (See § 361.5, subd. (b)(11) [relevant reunification services bypass provision].)

On November 7, 2019, Mother pleaded no contest and was convicted of child endangerment (Pen. Code, § 273a), and she was sentenced to two years in prison. She was transferred to a state prison facility. In a Last Minute Information for the Court, filed January 10, 2020, DCFS reported Mother could be eligible for parole in September 2020. In a Last Information for the Court, filed February 26, 2020, DCFS reported Mother was now eligible for visits with Xavier in the prison facility. No visits occurred prior to the adjudication hearing, which was held on February 26, 2020.

**B. Adjudication hearing**

On February 26, 2020, Mother, who was still incarcerated, appeared at the adjudication hearing. Without objection, the juvenile court admitted into evidence DCFS's reports in this matter (referenced above) and took judicial notice of documents in the San Bernardino County dependency proceedings involving

Xavier's half siblings (sustained petitions, case plans, findings, and orders). After hearing oral argument from the parties, the court sustained the dependency petition as to all counts (as summarized above). The court continued the matter for disposition and set the matter for a contest on DCFS's recommendation that Mother not receive reunification services in this case. Xavier remained placed with his half siblings in the home of Ms. D.

## C. DCFS's reports filed prior to the disposition hearing

In a Last Minute Information for the Court, filed July 13, 2020, DCFS reported Mother was housed in a "high-observation mental health module" at her place of incarceration. The facility's staff informed DCFS that Mother could not have any visitors due to the COVID-19 pandemic, regardless of whether visits could be arranged while she was housed in that unit.

In a Last Minute Information for the Court, filed September 11, 2020, DCFS reported Xavier was receiving Regional Center Services. His service provider informed DCFS that Xavier, who was two years and four months old, had an 11-month delay in receptive language, a 10-month delay in cognitive development, an eight-month delay in expressive language and self-help, a four-month delay socially and emotionally, and a three-month delay in gross and fine motor skills.

In a Last Minute Information for the Court, filed September 15, 2020, DCFS discussed an in person meeting between Mother and a social worker that occurred on August 26, 2020 at Mother's place of incarceration. Mother acknowledged she had bipolar disorder and stated she was taking prescribed

9

medication to treat her condition.  She said she planned to continue taking the medication after her release.

### D.  Disposition hearing

At the September 18, 2020 disposition hearing, Mother's counsel waived Mother's appearance.  Without objection, the juvenile court admitted into evidence DCFS's reports in this matter (referenced above).  The court declared Xavier a dependent of the court, removed him from Mother's custody, and ordered him suitably placed.  After hearing argument, the court declined to grant Mother reunification services, finding by clear and convincing evidence that the bypass provisions in section 361.5, subdivisions (b)(10)-(11) applied because Mother did not make a reasonable effort to treat the problems that led to removal of Xavier's half siblings from her custody (and ultimately termination of her reunification services and parental rights).  The court sent the matter for a permanency planning hearing under section 366.26.  The court made no change to the visitation order:  once-monthly monitored visits with Xavier while she was in custody and, after her release, monitored visits to occur two to three times per week.

## IV.  Mother's Visitation With Xavier, Beginning November 2020

In its section 366.26 report, filed January 15, 2021, DCFS stated Mother was released from custody in or around November 2020 and had participated in one monitored visit with Xavier at the park on November 24, 2020.  DCFS described the visit as follows:

"Xavier who is largely nonverbal, understands some receptive language, but struggles with expressive language, was largely quiet during the visit.  He would look to CSW [child's

10

social worker], and stare at mother, but was receptive to getting up and walking, pointing at different objects/animals and naming, chasing the pigeons (child initiated this on his own after the adults pointed at them), and sitting on the toddler swings at the park. These activities were largely suggested by CSW as mother appeared hesitant to initiate activity during the visit.

"Mother brought chicken nuggets from Burger King, and a sealed store-bought pre-sliced watermelon package, and juice for the child. Xavier ate a few of the chicken nuggets and attempted to play with a toy mother gave him. The toy was a liquid motion maze toy that you push a button and tilt to move the liquid. The toy, while not dangerous, was not developmentally appropriate. The child's hands were too small to push the small button even when using the full force of both thumbs. Mother tried to demonstrate for him the action of the toy, and he attempted to press the button to move the liquid. At one point during the visit, mother struggled to place the child in the toddler swing set, and requested CSW's assistance with his limbs. Xavier was mostly observant and hesitant, but not fearful during the visit. The child appeared to enjoy being outside, but was largely indifferent to mother. Mother would comment to CSW about how the child has grown since she last saw him, and bring up things she did in the past with her other children (re: prior monitored visits with Xavier's older half-siblings at the same park when she and her mother lived around the corner from the park)."

In a Status Review Report, filed March 17, 2021, DCFS updated the juvenile court on Mother's visitation with Xavier. On January 22, 2021, Mother had a monitored virtual visit with Xavier, who was now two years and nine months old. This was Mother's second visit with Xavier since he was detained from her

11

in September 2019.  DCFS described the virtual visit as follows: "During the visit, Xavier remained nonverbal and appeared disinterested.  Xavier said 'hi' to his mom but did not respond to questions such as 'did you eat today?' or 'how are you?'  Xavier looked off to the side frequently during the visit.  Mother stated that she did not wish to keep Xavier on the phone if he wasn't engaging in the visit, and CSW asked mother if she would like to end the visit.  Mother stated that she would like to end the visit, and she said goodbye to Xavier.  Xavier responded 'bye,' and the visit was ended."

As stated in the same Status Review Report, Mother had her third monitored visit with Xavier on February 26, 2021.  It was an in person visit at the park.  Mother brought Xavier snacks, juice, a basketball, a talking picture book, and a teddy bear.  When Mother arrived at the park, the social worker was pushing Xavier on a swing.  DCFS described the interaction between Mother and Xavier as follows:

"[M]other took Xavier out of the swing set to give him a hug.  Mother sat Xavier down next to her on a bench and gave him his presents and snacks.  Xavier did not appear fearful or hesitant around his mother, but Xavier was mostly quiet during the visit.  CSW suggested to mother that they move underneath the canopy as the sun was shining directly in front of mother and Xavier.  Mother agreed and moved her items to the picnic area beneath the canopy.

"During the visit, mother read to Xavier from the talking picture book, and Xavier appeared interested in the buttons that made sounds.  Xavier sat next to his mother as she read to him, and Xavier quietly ate his honey bun snack, and drank his Capri-Sun juice.  Xavier did not engage in any conversation with his

mother. Xavier would alternate between eating his snack and examining his toys. At the end of the visit, mother walked with CSW and Xavier back toward the car, and Mother leaned down to hug and kiss Xavier. Xavier appeared receptive to mother's affection, and Xavier said 'bye' to his mother."

In a further Status Review Report, filed on September 20, 2021, DCFS stated the following regarding Mother's visitation: "Mother . . . has continued to receive monitored visitation with the minor, and [the social worker] has acted as the monitor for the mother's visits. Visits with the mother are positive, and Xavier is comfortable around his mother and interacts with her throughout the visit. Mother is patient with Xavier and often brings food and toys for Xavier to play with. Mother reads stories to Xavier and encourages Xavier to read along. Mother has brought picture books to share with Xavier as well as videos. Mother will sit quietly with Xavier if he is focused on watching a video or is playing with a toy. Mother and Xavier also go outside to allow Xavier to ride tricycles and play basketball. Mother has continued to act appropriately during visitation and requires little to no redirection from [the social worker]." DCFS did not state the number of visits Mother had between March 17, 2021, the date the previous Status Review Report was filed, and September 20, 2021, the date this Status Review Report was filed.

DCFS recommended the juvenile court terminate Mother's parental rights and select adoption as Xavier's permanent plan. According to DCFS, Xavier was bonded to Ms. D., and she wanted to adopt him. At the time of the section 366.26 permanency planning hearing, which was held on October 1, 2021, when

13

Xavier was three years and five months old, Xavier had lived with Ms. D. for nearly two years.

## V.     Section 366.26 Hearing

At the October 1, 2021 section 366.26 permanency planning hearing, the trial court admitted DCFS's evidence without objection: two section 366.26 reports, filed on June 2, 2021 and September 30, 2021;[6] and a Status Review, filed on September 30, 2021. Xavier's counsel urged the juvenile court to follow DCFS's recommendation and terminate parental rights, arguing no exception to adoption applied.

Mother attended the section 366.26 hearing by telephone. She did not present any evidence. Her counsel argued: "Mother vehemently objects to [DCFS]'s recommendation. We are asking the court not to terminate parental rights. The bond between Mother and her child is too strong and it would not be in the best interest of the child if the court terminates parental rights. Mother has been working very hard. She did complete a parenting class. She completed numerous sessions of individual counseling. We urge the court that based on the bond that Mother has, it would be detrimental and not in the best interest to adopt this child. Mother would like an opportunity to reunify with the child." Counsel did not cite to evidence in support of this argument.

The juvenile court found no exception to adoption applied and ruled as follows, in pertinent part: "I am going to terminate parental rights today. Mother does visit with Xavier, but her

---

[6] We did not reference above these two section 366.26 reports because the information therein is not germane to the issues on appeal.

visits are still monitored. Her visits are not so frequent or so exceptional that there is a parental bond as defined under the law. Mother does have a bond with this child, but it is the loving bond that occurs between most every parent and child. But she has not stepped up to what would be considered a parental role in those visits beyond just being the mother. So she has not met her burden of proof for the parental bond exception, and any bond that does exist is outweighed by the benefits Xavier will have in having permanency through adoption with the caretaker, who has done a good job in raising him, and who also has a very good bond with the child." The court found by clear and convincing evidence that Xavier was adoptable, selected adoption as the permanent plan in Xavier's best interest, and designated Ms. D. as the prospective adoptive parent.

## DISCUSSION

### I.    Parental-Benefit Exception

Mother contends the juvenile court committed reversible error in finding the parental-benefit exception to termination of parental rights (§ 366.26, subd. (c)(1)(B)(i)) did not apply to her relationship with Xavier, as the court did not apply the applicable test set forth in *In re Caden C.*, *supra*, 11 Cal.5th 614 (*Caden C.*), decided by the Supreme Court four months before the section 366.26 hearing in this case. As explained more fully below, we agree with Mother that the trial court erred, but we conclude the error was harmless because Mother failed to carry her burden to establish the parental-benefit exception, in that the record is devoid of evidence satisfying the factual elements of the *Caden C.* test.

15

### A. Applicable law

When a juvenile court "cannot safely return a dependent child to a parent's custody within statutory time limits, the court must set a hearing under section 366.26." (*Caden C.*, *supra*, 11 Cal.5th at p. 630.) At the section 366.26 hearing, the juvenile court is required to select and implement a permanent plan for a dependent child. The "question before the court [at a section 366.26 hearing] is decidedly not whether the parent may resume custody of the child," as "reunification services have been terminated, and the assumption is that the problems that led to the court taking jurisdiction have not been resolved." (*Ibid*.) If the court determines by clear and convincing evidence that the dependent child is likely to be adopted, "the court shall terminate parental rights to allow for adoption" unless a parent shows termination would be detrimental to the child for one of the reasons enumerated in section 366.26, subdivision (c)(1). (*Caden C.*, at pp. 630-631.) If the parent makes the requisite showing, the "court should decline to terminate parental rights and select another permanent plan." (*Ibid*.) Only " 'in exceptional circumstances' " will a court choose a permanent plan " 'other than the norm, which remains adoption.' " (*Id*. at p. 631.)

The parental-benefit exception, at issue here, applies where the juvenile "court finds a compelling reason for determining that termination would be detrimental to the child" because: "The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) As our Supreme Court has explained, a parent must prove three elements "to establish the exception: (1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child

16

such that (3) the termination of parental rights would be *detrimental* to the child." (*Caden C., supra*, 11 Cal.5th at p. 631.) "[I]n assessing whether termination would be *detrimental*, the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home. [Citation.] By making this decision, the trial court determines whether terminating parental rights serves the child's best interests." (*Id.* at p. 632.)

As to the first element of the exception—regular visitation and contact—the "question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.' " (*Caden C., supra*, 11 Cal.5th at p. 632.) In evaluating this element, courts should not "punish parents or reward them for good behavior in visiting or maintaining contact – here as throughout, the focus is on the best interests of the child." (*Ibid*.) "Visits and contact 'continue[] or develop[] a significant, positive, emotional attachment from child to parent.' " (*Ibid*.)

"As to the second element, courts assess whether 'the child would benefit from continuing the relationship.' (§ 366.26, subd. (c)(1)(B)(i).) Again here, the focus is on the child. And the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' " (*Caden C., supra*, 11 Cal.5th at p. 632.) Courts "often consider how children feel about, interact with, look to, or talk about their parents. [Citations.] Doing so properly focuses the inquiry on the child, even as courts must remain mindful that rarely do '[p]arent-child relationships' conform to an entirely consistent pattern." (*Ibid*.)

To satisfy this element, "the parent must show that the child has a substantial, positive, emotional attachment to the parent – the kind of attachment implying that the child would benefit from continuing the relationship." (*Id*. at p. 636.)

"Concerning the third element – whether 'termination would be detrimental to the child due to' the relationship – the court must decide whether it would be harmful to the child to sever the relationship and choose adoption. (§ 366.26, subd. (c)(1)(B); see also § 366.26, subd. (c)(1)(D).) Because terminating parental rights eliminates any legal basis for the parent or child to maintain the relationship, courts must assume that terminating parental rights terminates the relationship. [Citations.] What courts need to determine, therefore, is how the child would be affected by losing the parental relationship – in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Caden C*., *supra*, 11 Cal.5th at p. 633.) "When the relationship with the parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child *due to*' the child's beneficial relationship with the parent. (§ 366.26, subd. (c)(1)(B)(i).)" (*Id*. at pp. 633-634.)

"When it weighs whether termination would be detrimental, the court is not comparing the parent's attributes as custodial caregiver relative to those of any potential adoptive parent(s). Nothing that happens at the section 366.26 hearing allows the child to return to live with the parent. [Citation.] Accordingly, courts should not look to whether the parent can provide a home for the child; the question is just whether losing the relationship with the parent would harm the child to an

extent not outweighed, on balance, by the security of a new, adoptive home. [Citation.] Even where it may never make sense to permit the child to live with the parent, termination may be detrimental. [Citation.] And the section 366.26 hearing is decidedly not a contest of who would be the better custodial caregiver." (*Caden C.*, *supra*, 11 Cal.5th at p. 634.) The parental-benefit exception does not permit "a judgment about the parent's problems to deprive a child of the chance to continue a substantial, positive relationship with the parent." (*Id.* at p. 643.)

As our Supreme Court pointed out, "the 'Task Force,' which the Legislature created in 1987 to redesign the dependency system and whose recommendations the Legislature adopted," "explained why the parental-benefit exception existed and when it should be applied: 'Termination would not be permissible, however, in the following situation[]: [¶] a) Termination would be detrimental to the child due to the strength of the parent-child relationship. There is substantial clinical evidence that some children in foster care retain very strong ties to their biological parents. Since termination in such situations is likely to be harmful to the child, courts should retain parental ties if desired by both the parents and the child.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 635.)

The parent challenging the termination of parental rights based on the parental-benefit exception has the burden of proving by a preponderance of the evidence that the exception applies. (*Caden C.*, *supra*, 11 Cal.5th at p. 629.)

We review the juvenile court's determination whether the parent has visited and maintained contact with the child consistently, given the extent permitted by the court's orders, for

19

substantial evidence. (*Caden C.*, *supra,* 11 Cal.5th at pp. 639-640.) We likewise review for substantial evidence the court's determination whether the relationship is such that the child would benefit from continuing it. (*Id.* at p. 640.) We may " 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts,' " and we will uphold the trial court's determinations supported by substantial evidence even if " 'substantial evidence to the contrary also exists.' " (*Ibid.*)

We review whether termination of parental rights would be detrimental to the child for abuse of discretion. (*Caden C.*, *supra,* 11 Cal.5th at p. 640.) "A court abuses its discretion only when ' " 'the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.' " ' [Citation.] But ' " '[w]hen two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.' " ' " (*Id.* at p. 641.)

### B.    The error

Mother contends the juvenile court erred because it applied an incorrect legal standard in finding the parental-benefit exception to termination of parental rights did not apply to Mother's relationship with Xavier. We agree. Based on the court's statements when it ruled on this matter at the section 366.26 hearing, the court focused its analysis on whether Mother established a "a parental role in [her] visits [with Xavier] beyond just being the mother." A "parental role" is not an element of the parental-benefit exception. (See § 366.26, subd. (c)(1)(B)(i).)   In *Caden C.*, *supra,* 11 Cal.5th 614, our Supreme Court did not

define or mention a "parental role" in discussing the application of the parental-benefit exception.[7]

As the Court of Appeal explained in *In re L.A.-O.* (2021) 73 Cal.App.5th 197 (*L.A.-O.*), "the words 'parental role,' standing alone, can have several different meanings. They can mean being the person whom the child regards as his or her parent (or at least as more his or her parent than any other caregiver). However, we already know that the parental-benefit exception does not require that the parent be the child's primary attachment. [¶] They can mean being a *good* parent – nurturing, supportive, and guiding. *Caden C.*, however, tells us that the parental-benefit exception does not require being a good parent; it does not require that the parent have overcome the struggles that led to the dependency, and it does not require that the parent be capable of resuming custody. [¶] These words can also mean giving parental care, such as changing diapers, providing toys and food, and helping with homework. This would conflict, however, with *Caden C.*'s warning that 'rarely do "[p]arent-child relationships" conform to an entirely consistent pattern.' " (*Id.* at p. 210.)

As we stated in *In re Katherine J.* (2022) 75 Cal.App.5th 303 (*Katherine J.*): "While each of these definitions [set forth above] may be useful as *factors* to determine the strength of a parent's relationship with their child, none is dispositive on its

_____

[7] The Supreme Court issued its opinion in *Caden C.* four months before the section 366.26 hearing in this case. Neither the parties nor the juvenile court referenced *Caden C.* or the tripartite analysis the Supreme Court announced in *Caden C.* for applying the parental-benefit exception.

21

own.  Therefore, problems arise when juvenile courts use the phrase 'parental role' without explaining which meaning(s) they impart to it." (*Id*. at p. 319.)  Here, we cannot discern what the juvenile court meant by "parental role" and whether the court's definition contravenes the analysis in *Caden C.* for application of the parental-benefit exception.

Mother argues the juvenile court's error requires that we reverse the order terminating parental rights and remand the matter for a new section 366.26 hearing where the court will reconsider application of the parental-benefit exception in light of *Caden C.*  DCFS argues this case is amenable to a state law harmless error analysis under *People v. Watson* (1956) 46 Cal.2d 818, 836 because Mother did not meet her burden to show the parental-benefit exception applies to her relationship with Xavier.  We agree with DCFS's position.  As explained more fully below, the record before us is devoid of evidence establishing the first two elements of the parental-benefit exception under *Caden C.*'s test.  Thus, the error is harmless because it is not reasonably probable the result would have been more favorable to Mother if the court had applied the correct legal standard under *Caden C.*

### C.    Harmless error analysis

"The California Constitution prohibits a court from setting aside a judgment unless the error has resulted in a 'miscarriage of justice.'  (Cal. Const., art. VI, § 13.)" (*In re Celine R.* (2003) 31 Cal.4th 45, 59-60.)  Applying the *Watson* harmless error standard for state law error, we reverse an order in a dependency case only if we find it is reasonably probable the result would have been more favorable to the appellant but for the error.  (*Id*. at p. 60.)  A juvenile court's error "is amenable to harmless error analysis" where determining prejudice does not "require 'a speculative

22

inquiry into what might have occurred in an alternative universe.' " (*In re James F.* (2008) 42 Cal.4th 901, 915.)  This is such a case where the harmless error analysis requires no speculation.  The evidence in the record before us is insufficient as a matter of law to show the factual elements necessary to establish the parental-benefit exception to termination of parental rights.

We invited the parties to submit supplemental briefing regarding the application of a harmless error analysis in this case.  In her supplemental briefing, Mother acknowledges that where a juvenile court applies an incorrect legal standard under *Caden C.*, a case may be amenable to a harmless error analysis where there is a failure of proof on the first two (factual) elements of the *Caden C.* test, as opposed to the third (discretionary) element.  She asserts, however, that the juvenile court here found that she satisfied the first two elements.  It did not, and it could not, based on the lack of evidence in the record, as explained below.  We note this is not a case where there is evidence in the record supporting the first two elements of the *Caden C.* test, and remand is required for error under *Caden C.* so the trial court may properly exercise its discretion as to the third element of the test.  (Cf. *In re D.M.* (2021) 71 Cal.App.5th 261, 271 ["We cannot know how the court would have exercised its discretion if it had the benefit of the *Caden C.* analysis when making its ruling.  We believe the juvenile court should make this determination in the first instance"].)

### 1. Regular visitation and contact

As to the first element of the exception—regular visitation and contact—the "question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court

23

orders.' " (*Caden C., supra,* 11 Cal.5th at p. 632.) Mother asserts the juvenile court found she maintained regular visitation and contact with Xavier, thus satisfying the first element of the *Caden C.* test. While the juvenile court noted Mother was visiting Xavier, it made no finding the visitation was regular or consistent. Rather, the court stated Mother's visits were "not so frequent or so exceptional that there is a parental bond as defined under the law." The court could not have made a finding that Mother satisfied this element of the exception because there is no evidence in the record showing regular visitation and contact.

In the months following Mother's September 5, 2019 arrest, and before the pandemic began, Mother did not have any visits with Xavier because of her reported hostile and uncooperative behavior at the detention facility. After Mother was released from custody, she had two in person visits and one virtual visit with Xavier over four months between November 2020 (the month of her release) and March 17, 2021 (the date DCFS prepared one of its status review reports). That is fewer than one visit per month, although the juvenile court's order allowed Mother two to three visits *per week*. Mother did not present evidence of any extenuating circumstances that prevented her from visiting regularly under the terms of the court's visitation order. As set forth above, Mother did not present any evidence at all concerning the parental-benefit exception to termination of parental rights.

Based on the record, we know Mother visited Xavier in the period between March 17, 2021 and September 20, 2021 (the date of DCFS's next status review report, shortly before the section 366.26 hearing), but we do not know how many visits occurred

and if the visits occurred regularly under the terms of the court's visitation order.  A finding that Mother visited Xavier regularly in the six months before the section 366.26 hearing would be based on pure speculation.

To establish the parental-benefit exception to termination of parental rights, it was Mother's burden to show regular visitation and contact with Xavier, and she failed to satisfy her burden.  Given Mother's failure of proof on this element, the juvenile court's error in applying an incorrect legal standard under *Caden C.* is harmless.  Even if there was evidence that Mother's visits were regular and consistent during the six months before the section 366.26 hearing, and that was deemed sufficient to establish the first element of the *Caden C.* test, we would affirm the order terminating Mother's parental rights due to a failure of proof on the second element, as set forth below.

### 2. Beneficial relationship

*Caden C.* describes the second element of the exception as "a *relationship*, the continuation of which would *benefit* the child." (*Caden C.*, *supra*, 11 Cal.5th at p. 631.)  To satisfy this element, a parent must show "something more than the incidental benefit a child gains from any amount of positive contact with [his or] her natural parent." (*Katherine J.*, *supra*, 75 Cal.App.5th at p. 318.)  The parent must show that he or she is more than "a mere 'friendly visitor.' " (*Id.* at p. 319.)  Rather, the "parent must show that the child has a substantial, positive, emotional attachment to the parent – the kind of attachment implying that the child would benefit from continuing the relationship." (*Caden C.*, at p. 636.)  The determination on this element of the *Caden C.* test, like the determination on the first

element of the test, is a factual matter, not a discretionary one. (*Id.* at p. 640.)

Mother asserts the juvenile court found she satisfied this element. While the court did state Mother had a bond with Xavier, the court said nothing about Xavier having an attachment to Mother. And there is no evidence in the record from which such an attachment can be inferred.

Xavier was just 16 months old when he was detained from Mother. He did not see Mother again for more than two years. We quoted above the paragraphs in DCFS's reports describing Mother's interactions and relationship with Xavier in the year before the section 366.26 hearing. There is nothing in the reports indicating Xavier had a substantial, positive, emotional attachment to Mother, or any attachment to her at all. DCFS described in detail the three visits that occurred between November 2020 and March 17, 2021 (two in person and one virtual). On all three occasions, the social worker who monitored the visits reported that Xavier was largely indifferent to Mother. On the third visit, Xavier was reportedly receptive when Mother initiated a hug and a kiss at the end of the visit. In DCFS's summary of the visits that occurred in the six months before the section 366.26 hearing, DCFS reported: "Visits with the mother are positive, and Xavier is comfortable around his mother and interacts with her throughout the visit." To infer, based on this statement, that Xavier had a substantial, emotional attachment to Mother—as opposed to the type of relationship a child would have with a friendly visitor—would be pure speculation.

Mother appeared at the section 366.26 hearing and chose not to present any evidence in support of her assertion the parental-benefit exception to termination of parental rights

applied to her relationship with Xavier. There is insufficient evidence in the record as a matter of law to support the first two elements of the *Caden C.* test, which are factual, not discretionary, matters. In light of Mother's failure of proof, the juvenile court's error is harmless. We need not address the third element of the *Caden C.* test.

## II.    ICWA

### A.    ICWA Facts and Proceedings

An August 20, 2015 minute order from the dependency proceedings in Xavier's half siblings' case, which is included in the record before us, states that the juvenile court in San Bernardino County found ICWA did not apply.

On September 5, 2019, when a social worker in the present case spoke to Mother on the day of her arrest for child endangerment, Mother told the social worker she had Indian ancestry. In the Detention Report, filed September 9, 2019, DCFS summarized Mother's statements to the social worker as follows: "Mother . . . stated that there is American Indian Heritage on her side of the family. Mother stated that she is in the process of enrolling herself and the children. Mother stated that she needs to do it soon so she does not have to deal with DCFS anymore. Mother stated that she was not going to provide CSW with the name of the tribe until she has successfully enrolled along with her children." Form ICWA-010(A), attached to the dependency petition, indicated Xavier may have Indian ancestry.

On September 30, 2019, when Mother made her first appearance in these dependency proceedings, she filed form ICWA-020, Parental Notification of Indian Status. She checked the box on the form indicating, "I may have Indian Ancestry," and

27

she identified the tribe as Cherokee.  As reflected in the minute order from the September 30, 2019 hearing, the juvenile court ordered DCFS to investigate Mother's claim of Indian ancestry.

On October 24, 2019, a dependency investigator interviewed Mother regarding possible Indian ancestry.  In the Jurisdiction/Disposition Report, DCFS summarized Mother's statements as follows:  "On 10/24/2019, mother informed [the dependency investigator] that she is Creole, and she is 60% Indian Cherokee and Geechee.  Mother reported that she is also French and Hessian.  Mother reported that land was stolen from her grandmother.  Mother reported that she has not yet registered [with a tribe]."

On October 30, 2019, DCFS sent notice of the adjudication hearing (form ICWA-030, Notice of Child Custody Proceeding for Indian Child) by certified mail, with return receipt requested, to the Bureau of Indian Affairs (BIA), the Secretary of the Interior, the Cherokee Nation of Oklahoma, the United Keetoowah Band of Cherokee Indians, and the Eastern Band of Cherokee Indians.  The notices included information about Xavier, Mother, Xavier's maternal grandparents, and Xavier's maternal great-grandparents.  For Mother, the notices listed the possible tribe and location as Cherokee and Oklahoma.  For Xavier's maternal grandmother, the notices listed the possible tribe and location as "Gullah AKA Geechee" and Texas.  For Xavier's maternal grandfather, the notices listed the possible tribe and location as Cherokee and Muskogee, Oklahoma.  In the "Additional information" section under the entry for Mother's information, DCFS wrote:  "Maternal Grandfather stated that his Aunt received payments from the Cherokee Nation of Oklahoma.

28

Maternal Grandmother stated that her mother was full blood Gullah Indian."

On November 4, 2019, the juvenile court continued the adjudication hearing and ordered DCFS to file a report before the next hearing with an "update on ICWA notice." DCFS provided the update in a Last Minute Information for the Court, filed January 10, 2020. DCFS attached to this report a December 3, 2021 letter from the Eastern Band of Cherokee Indians, stating that based on the information DCFS provided, Xavier was neither registered nor eligible to register as a member of the tribe, and he was not an Indian child in relation to the tribe. DCFS also attached the return receipts from all the notices it sent to the tribe/bands, the BIA, and the Secretary of the Interior.

At the continued hearing on January 13, 2020, the juvenile court found ICWA does not apply in this case.

## B.    Applicable law

Under ICWA, an "Indian child" is an unmarried person under 18 years of age who is (1) a member of a federally recognized Indian tribe or (2) is eligible for membership in a federally recognized tribe and is the biological child of a member of a federally recognized tribe. (25 U.S.C. § 1903(4) & (8); see § 224.1, subd. (a) [adopting federal definitions].)

DCFS and the juvenile court "have an affirmative and continuing duty to inquire whether a child" involved in dependency proceedings "is or may be an Indian child." (§ 224.2, subd. (a).) When DCFS detains a child and places that child in foster care, its duty to inquire "includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the

child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled." (§ 224.2, subd. (b).) Under ICWA, the term "extended family member" is "defined by the law or custom of the Indian child's tribe or, in the absence of such law or custom, shall be a person who has reached the age of eighteen and who is the Indian child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin or stepparent." (25 U.S.C. § 1903(2).)

"At the first appearance in court of each party, the court shall ask each participant present in the hearing whether the participant knows or has reason to know that the child is an Indian child" (§ 224.2, subd. (c)) and order the parents to complete form ICWA-020 (Parental Notification of Indian Status). (Cal. Rules of Court, rule 5.481(a)(2)(C).)

If the juvenile court or social worker "has reason to believe that an Indian child is involved in a proceeding," based on the initial inquiry described above, the court or social worker "shall make further inquiry regarding the possible Indian status of the child," including, but not limited to: (1) interviewing the parents and extended family members; (2) contacting the BIA and the State Department of Social Services for assistance in identifying and contacting tribes; and (3) contacting tribes and others "that may reasonably be expected to have information regarding the child's membership status, or eligibility." (§ 224.2, subd. (e).) There is reason to believe a child is an Indian child if there is information suggesting that either the child or the parent is a member or may be eligible for membership in an Indian tribe. (§ 224.2, subd. (e)(1).) "Information suggesting membership or

30

eligibility for membership includes, but is not limited to, information that indicates, but does not establish, the existence of one or more of the grounds for reason to know enumerated in paragraphs (1) to (6), inclusive, of subdivision (d)," which we set forth below. (*Ibid.*)

The purpose of interviewing extended family members as part of further inquiry is "to gather the information required in paragraph (5) of subdivision (a) of Section 224.3." (§ 224.2, subd. (e)(2)(A).) Such information includes: "All names known of the Indian child's biological parents, grandparents, and great-grandparents, or Indian custodians, including maiden, married, and former names or aliases, as well as their current and former addresses, birth dates, places of birth and death, tribal enrollment information of other direct lineal ancestors of the child, and any other identifying information, if known." (§ 224.3, subd. (a)(5)(C).)

ICWA notice is required if DCFS or the juvenile court knows or has reason to know a child is an Indian child under any of the circumstances described in section 224.2, subdivision (d). (25 U.S.C. § 1912(a); § 224.3, subd. (a); Cal. Rules of Court, rule 5.481(b)(1).) Under subdivision (d), "There is reason to know a child involved in a proceeding is an Indian child under any of the following circumstances:

"(1) A person having an interest in the child, including the child, an officer of the court, a tribe, an Indian organization, a public or private agency, or a member of the child's extended family informs the court that the child is an Indian child.

"(2) The residence or domicile of the child, the child's parents, or Indian custodian is on a reservation or in an Alaska Native village.

"(3) Any participant in the proceeding, officer of the court, Indian tribe, Indian organization, or agency informs the court that it has discovered information indicating that the child is an Indian child.

"(4) The child who is the subject of the proceeding gives the court reason to know that the child is an Indian child.

"(5) The court is informed that the child is or has been a ward of a tribal court.

"(6) The court is informed that either parent or the child possess an identification card indicating membership or citizenship in an Indian tribe." (§ 224.2, subd. (d).)

### C.   Analysis

Mother concedes DCFS fulfilled its duties to make inquiries of extended family members and included all requisite information on the ICWA notices it sent.  She argues, however, that DCFS failed to follow up on "some collateral information" it included in the ICWA notices in the "Additional information" section:  "Maternal Grandfather stated that his Aunt received payments from the Cherokee Nation of Oklahoma.  Maternal Grandmother stated that her mother was full blood Gullah Indian."  The applicable law we set forth above does not require DCFS to take further action concerning this information, and Mother cites no authority indicating such a requirement.

There is no section on an ICWA notice for listing identifying information about a great-great-aunt, as such a relative is not a direct lineal ancestor of the child.  Nonetheless, DCFS included on the ICWA notice the information it had received from Xavier's maternal grandfather about Xavier's great-great-aunt.  Neither the BIA, the Secretary of the Interior nor the tribe/bands requested identifying information about the

great-great-aunt in determining whether Xavier is an Indian child.  Moreover, Mother's suggestion that DCFS could have obtained information identifying Xavier's great-great-aunt is speculative.  We have no reason to believe such information was available to DCFS.

Mother acknowledges that Gullah or Geechee is not a federally recognized Indian tribe.  ICWA imposes no duty on DCFS to investigate ancestry related to a non-federally recognized tribe.  (*In re Jonathon S.* (2005) 129 Cal.App.4th 334, 338, citing 25 U.S.C. § 1903(8) [" 'Indian tribe' is defined so as to include only federally recognized Indian tribes"].)

Mother has demonstrated no error under ICWA or California law implementing ICWA.

### DISPOSITION

The order terminating parental rights is affirmed.

NOT TO BE PUBLISHED


CHANEY, J.

We concur:


ROTHSCHILD, P. J.


MORI, J.*

---

\* Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.